UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

    - against -

EMMA POROGER

    Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11-CR-742 (DLI)

# MEMORANDUM IN AID OF SENTENCING

CREIZMAN PLLC
Eric M. Creizman
Melissa Madrigal
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 972-0200
Facsimile: (646) 200-5022

*Attorneys for Emma Poroger*

April 10, 2015

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

PERSONAL BACKGROUND ........................................................................................ 3

    I. Childhood……………........................................................................................ 3

    II. Devotion to Family and Friends........................................................................ 4

    III. Medical Training............................................................................................... 7

    IV. Devotion to Patients......................................................................................... 8

    V. Severe Health Problems.................................................................................... 9

    VI. Fall From Grace ............................................................................................ 10

THE OFFENSE CONDUCT…………………………………………………………… 12

THE GUIDELINES CALCULATION…………………………………………………. 13

ANALYSIS OF AN APPROPRIATE SENTENCE UNDER 18 U.S.C. § 3553(A)…………………................................................................................................ 18

CONCLUSION…………………………………………………………………………... 25

We respectfully submit this memorandum on behalf of Dr. Emma Poroger in connection with her sentencing before Your Honor scheduled for Tuesday, April 21, 2015, at 10 a.m.  Dr. Poroger entered a guilty plea to a single-count superseding information charging her with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1347, pursuant to a plea agreement almost three years ago, on May 2, 2012.

## PRELIMINARY STATEMENT

Emma Poroger stands before this Court for sentencing as a broken woman, who, at the relatively young age of 59, believes that she has little to enjoy or strive for and that her future is bleak.  In a period of just over three-and-a-half years, this criminal prosecution has sapped her of her savings, stripped her of a career in medicine, divested her of her home, and constrained her liberty, including her freedom to travel.  The stress and remorse that Dr. Poroger has experienced as a result of this case have taken their toll on her physical and psychological health.  As detailed in the reports prepared by the Probation Department, Dr. Poroger struggles with hypertension and multiple cardiac conditions, physical disabilities due to lower back and pelvic pain, vision impairments, and chronic vertigo, among other conditions.  She often relies on a cane to walk, and takes numerous medications on a daily basis.  Dr. Poroger also suffers from severe depression and anxiety, has experienced suicidal ideation, and has been hospitalized for suicidal behaviors.  Her declining physical and mental health led to the deterioration of a committed relationship with her lover.  The impact of this criminal case has had such a devastating impact on Dr. Poroger's life that a sentence of imprisonment is simply unnecessary for any deterrent purposes or punishment.  The objectives of federal sentencing have already been satisfied during the three-and-a-half years Dr. Poroger has served under pretrial supervision.

A non-custodial sentence is warranted not only because of the negative consequences Dr. Poroger has endured as a result of her wrongdoing, but also, if not more so, because of her affirmative efforts to accept responsibility for her wrongdoing and to cooperate with the government in its investigation. Her conduct in this regard is detailed in the government's letters to the Court dated August 15, 2012, September 28, 2012, and April 3, 2015, which were submitted under seal in support of the government's motion in connection with Dr. Poroger's sentencing, as well as in status updates to the Court in letters dated November 7, 2013, February 24, 2014, October 28, 2014, January 30, 2015, and February 20, 2015. Dr. Poroger has demonstrated, through her actions, her substantial remorse for her participation in the offense, and her commitment to redress the harms caused by the members of the health care fraud conspiracy. Her lengthy, spotless record of compliance with all of the conditions of her pretrial release, also establishes that she presents no risk of recidivism and that she will continue to be a law-abiding, productive member of society as she has been over the vast majority of her life.

Given Dr. Poroger's constructive behavior since her arrest, and the serious consequences she has faced as a result of this prosecution, the mitigating factors concerning Dr. Poroger's relative culpability in the offense also compel the conclusion that a non-custodial sentence is "sufficient, but not greater than necessary" to achieve the goals of sentencing. Specifically, there is no dispute that while working at the North Austin clinic, Dr. Poroger sincerely cared for her patients, performed procedures that she believed were medically necessary, regularly worked twelve to fourteen hour days, and honestly reported the treatments she provided to her office management and the billing company. She never sought to bill Medicare for treatments that

were unnecessary or for treatments that were not performed, and was unaware of the massive

scope of the fraudulent billing to Medicare until after she began cooperating with the

government.  She did not plan the fraudulent scheme, did not support it, and did not seek to

profit from it.  What Dr. Poroger admittedly did wrong, is that, in September 2008, less than six

months before she left the North Austin practice, she discovered that office management and the

billing company had submitted a fraudulent bill for a test that had not been performed.  At that

point, she was on notice that fraudulent bills were likely being submitted under her name and

nevertheless continued to treat patients at the North Austin Facility, and never reported the

fraudulent billing to Medicare or law enforcement.  Nor did she undertake any investigation to

determine the extent of the fraudulent billing or take sufficient action to prevent further

fraudulent billing.  Dr. Poroger's severe lapse in judgment constitutes a significant offense, but

in light of her productive conduct since her arrest and the severe price she has paid for her

wrongdoing, we respectfully submit that a non-custodial sentence is warranted here.

**PERSONAL BACKGROUND**

### I.          Childhood

Dr. Poroger, who is 59 years old, was born and raised in Chernovtsy, Ukraine.  Her

father, Nusim, was a hat-maker, and her mother, Khayka, now deceased, a military sales woman.

(PSR ¶ 23).  As a child, Dr. Poroger was raised in a middle-income household.  (PSR ¶ 24).

Although all of her economic needs were met while growing up in the former Soviet Union, Dr.

Poroger was the victim of religious persecution because of her Jewish faith.  *Id.*  Other children

beat and abused Dr. Poroger as punishment for her religious identity.  *Id.*

3

## II.                    Devotion to Family and Friends

Dr. Poroger has one son, Feliks Koyfman, a 37 year-old physician who resides in

Mineola, New York. (PSR ¶ 25).   Feliks was born in Chernovtsy, Ukraine to the marital union

of Dr. Poroger and Aleksandr Koyfman.  Dr. Poroger and Dr. Koyfman divorced but they

continue to share a friendly relationship. *Id.*  On December 22, 1992, Dr. Poroger and Feliks,

then 14 years old, emigrated from Ukraine as religious refugees and legally entered the United

States where they settled in Brooklyn, New York. (PSR ¶ 27).

As described by one of the many letters submitted by Dr. Poroger's supporters to the

Court, Dr. Poroger's "life story is not unlike many other immigrants.  She came to this country in

refuge of a bright future for her son." (Ex. A).  After arriving in the United States, Dr. Poroger

worked cleaning houses in Brooklyn for approximately 9 months to provide for her family. (PSR

¶ 51).  Dr. Poroger's "goal was to do everything possible to help her son to achieve and excel"

(Ex. B) which Feliks clearly accomplished as evidenced by the fact that he followed his mother's

positive influence and became a physician. "My Mother is directly responsible for my

success…she instilled in me from an early age that hard work, integrity, perseverance, and

honesty are the keys to a full life and successful career." (Ex. C).

Emma Poroger's mother, Khayka, died at the age of 60 from psoriasis of the liver.  (PSR

¶ 23).  Khayka lived through Nazi occupation and concentration camps in the difficult post war

Russian system and was infected with a virus while working at a labor camp.  "Emma's goal in

life was to help her mother…She did become a doctor but too late to help her mom."  (Ex. D).

4

Dr. Poroger is the principal caretaker of her father who is 93 years old. (PSR ¶ 23). Nusim, her father, suffers from a myriad of health problems associated with his advanced age. Dr. Poroger provides a significant amount of medical care and assistance to her elderly father on a daily basis. *Id.* Similarly, Dr. Poroger helps care for Riva, her stepmother, who is 86 years of age and also suffers from a myriad of health ailments associated with her advanced age. *Id.* Because Dr. Poroger is the principal provider to Nusim and Riva, no one else can quite fill her shoes in this regard if she is sentenced to prison.

In his letter to the Court, Nusim writes, "she has practically returned me from the other side several times. I have been battling bladder cancer and going through chemotherapy. And only Emma's patience and dedication to my treatment helped me stay alive." (Ex. E). Nusim describes how Dr. Poroger visits him daily to check his vital signs, cook for him, and take him to his appointments. Nusim felt compelled to tell the Court "I survived the Holocaust, but lost almost my entire family. [My daughter] is my family and my life; please don't take her away from me." *Id.*

In their letters to the Court, family members express grave concerns for Emma's father if Dr. Poroger is unable to care for him. (Ex. F); (Ex. G); (Ex. H) ("[Nusim] has suffered several falls in this past year, and after each one Emma would rush to his side, caring for him, cooking his favorite meals, and tending to his injuries. With Emma in prison, I am very concerned for my grandfather's welfare since my father and I live in Toronto.") Dr. Poroger's nephew, Igor Poroger, who is a barrister in Ontario, tells the Court "[Emma] has consistently aided [my]

5

elderly grandfather with [his] medical needs throughout the years.  Without Emma around, it is uncertain how my 93 year old grandfather will manage on a day to day basis." (Ex. I).

Almost all of the letters to the Court use the world "selfless" to describe Emma Poroger. (Ex. J).  Monika Paroder recounts when her father, who is Dr. Poroger's cousin, was diagnosed with cancer: "The following months were a tumultuous whirlwind of fear, hope, anger, and pain…during this time, Emma was the voice of optimism; Emma was the voice of knowledge; Emma was the voice of hope.  She was a solid stone for us to lean against." (Ex. A).  Similarly, Aleksandr Koyfman, Dr. Poroger's ex-husband, who has battled 3 forms of cancer describes "Emma was there for me during those tough times, frequently visiting me in the hospital and helping me [get] through chemo and radiation treatments."  (Ex. K).  When family friend Lyuba Lebedeva's mother was diagnosed with stage 4 pancreatic cancer, Dr. Poroger was one of the first people to reach out to Lyuba with words of support and advice.  (Ex. L).

Sema Krichman describes how Emma Poroger routinely finds time to check in and give necessary advice to Sema regarding her 92 year old mother.  (Ex. M).  Dr. Poroger helps those in need:  (i) driving a friend to do groceries after Hurricane Sandy hit—otherwise Alla would not have had any means to get the products home (Ex. N); (ii) driving pregnant friend Irina to her doctors' appointments (Ex. O); (iii) indefinitely opening her home during Hurricane Irene to the Ozeryan family who did not have a safe place to stay—Dr. Poroger drove from Staten Island to Coney Island to pick them up (Ex. P); (iv) traveling a long distance to friend Elena's house on a late Friday afternoon to give Elena's son an injection to treat poison ivy (Ex. Q).

**III.**                          **Medical Training**

While living in Ukraine, Dr. Poroger attended Chernovtsy Medical School and graduated

in 1978 as a qualified medical doctor. (PSR ¶ 39).   Anatoly Goldenfeld recalls the

discrimination against Jewish people in terms of admission to medical school, but describes how

Dr. Poroger not only successfully completed medical school but did so as one of the best

students at Chernovtsy. (Ex. R).  Dr. Poroger worked as a physician in Ukraine from 1978 to

1992: (i) chief of the emergency division of Storozhynets Hospital (1978-1982) (PSR ¶ 52); and

(ii) internal medicine physician for the Chernovtsy District Psychiatric Hospital (1982-1992)

(PSR ¶ 53).  At the age of 42, and less than 5 years after emigrating from Ukraine with her

young son, Dr. Poroger attended medical school once more, this time at the New York College

of Osteopathic Medicine in Old Westbury, New York. (PSR ¶ 27).  As Dr. Poroger's nephew,

Igor, observed "Emma's ethos for hard work and determination has been an inspiration to those

around her.  She put herself through medical school, well into her middle age, and never asked

for any help from anyone."  (Ex. I).  Emma attended English classes when she first moved to the

United States and as family friend, Denis Shtabel recalls, "During the late 90's when I would

visit her home, I would see stacks of medical books, notes, diagrams, and English/Russian

dictionaries opened and being used in every room and on every desk/table of her house.  She was

immersed in studying." (Ex. S).  In 2000, Dr. Poroger completed medical school and undertook a

medical internship and residency in New Jersey. (PSR ¶ 27).  Dr. Poroger secured licenses to

practice medicine in New York, New Jersey, and Florida and also achieved board certification by

the American Osteopathic Board of Family Medicine. (PSR ¶ 38).

7

**IV.**                    **Devotion to Patients**

Dr. Poroger's patients admire and respect her, which is reflected by the many letters to the Court from patients who have stood by Dr. Poroger during the last four years since her legal, financial, and personal circumstances deteriorated.  At the time of her arrest, Dr. Poroger ran a private medical practice, Penfel Medical, PC, with two offices: (i) Jersey City, New Jersey; and (ii) Staten Island, New York. (PSR ¶ 40).  After her arrest, insurance companies began to steadily drop Dr. Poroger as a covered medical provider and neither of her offices was able to earn a profit.  Dr. Poroger kept the offices open, albeit on a part-time basis, and operated at a loss because she believed in serving her patients who relied on Dr. Poroger's care. *Id.*

What really sets Dr. Poroger apart from the norm is her unparalleled compassion and respect for her patients.  Leonid Katsman, a longtime patient of Dr. Poroger, echoes these sentiments.  "Dr. Poroger has demonstrated the utmost respect for me as a patient" and "I have on many occasions witness[ed] her compassion, care, and courtesy" in treating other patients. (Ex. T).  As Yaniris Candelaria, a medical assistance who worked with Dr. Poroger for many years recounts, "The time I have spent in her office, I could understand why her patients loved her so much.  She was very attentive and concerned about not only their medical needs, but to their needs as people." (Ex. U).

Dr. Poroger made a difference in the lives of many patients.  (Ex. V).  Izabella Genin, a patient of Dr. Poroger recounts how she met Dr. Poroger in a difficult time of her life.  "It was after a car accident with a drunk driver in which I sustained serious injuries that greatly affected my personal and professional life.  Under the devoted and exceptional care of Dr. Poroger, I was

8

able to continue working until my retirement and be free from pain in my everyday activities."
(Ex. W).

According to Tatyana Katsman, Doctor of Osteopathic Medicine, and colleague to Dr.
Poroger "over the years I have seen Dr. Poroger serve her patients to a degree that is compared to
none." (Ex. X).  Dr. Poroger is known to answer her patients' calls to her cellular phone "24
hours a day, 7 days a week." (Ex. Y); (Ex. Z).

**V.**              **Severe Health Problems**

Since her arrest, Dr. Poroger has suffered from a myriad of physical and mental health
problems, which are well documented in the PSR and the Addendums to the PSR.  Beginning in
January 2011, Dr. Poroger fell into a severe depression and began to experience suicidal
thoughts.  In March 2011, Dr. Poroger sought treatment for her depression attending regular
therapy sessions with a psychiatrist. In January 2013, Dr. Poroger was diagnosed with major
depressive disorder and anxiety disorder, with severe helplessness and hopelessness. (Second
PSR Addendum).  As a result, Dr. Poroger takes multiple daily medications to treat her anxiety
and depression. *Id.*  Dr. Poroger also attends biweekly psychotherapy sessions in addition to the
psychotropic medications she takes regularly.  (Ex. AA).   Dr. Poroger has expressed to her
pretrial services officer that "she will not survive if she has to go to prison" and doesn't know
how she will "go on." (Second PSR Addendum).  Dr. Poroger's son reported that prior to her
arrest, she did not suffer from any mental health or emotional problems. (PSR ¶ 31).

In addition to her mental health and emotional problems, Dr. Poroger has been diagnosed
with a number of conditions for which she takes a significant amount of prescription medication.

(Second PSR Addendum).  In 2011, Dr. Poroger underwent surgery as a preventative measure due to the discovery of pre-cancerous cells. (PSR ¶ 33).  In 2012, she was diagnosed with multiple cardiac conditions, including hypertension and severe diastolic heart failure—conditions which prevent her from working full time and which require regular medical care. (Second PSR Addendum).  In 2012, Dr. Poroger was also diagnosed with chronic severe low back pain and pelvic pain due to lumbar-sacral spondylitis, which prevents Dr. Poroger from walking for more than 20 minutes or sitting for more than 40 minutes. *Id.*  She was also diagnosed in 2012 with pituitary adenoma and chronic hypertensive vascular changes—which rendered her "functionally significantly disabled" and "practically disable[d]." *Id*; (Ex. BB).  Dr. Poroger receives acupuncture treatments regularly to combat migraine headaches, dizziness, vertigo, insomnia, anxiety, depression, constipation, incontinence, tinnitus, pain in the neck, lower back, shoulders, knees, legs and feet. (Ex. CC).  Due to Dr. Poroger's severe medical problems and resulting disability, she stopped working in December 2012 and began to draw disability payments from her life insurance company. (Second PSR Addendum).

## VI.        Fall From Grace

Since her arrest in the instant offense, Dr. Poroger has suffered debilitating loss in multiple aspects of her life: health wise—mentally, emotionally, and physically; financially; and professionally.  According to Dr. Poroger's psychiatrist, Dr. Isakov, Dr. Poroger "fears to be left alone," has become "isolative and withdrawn" since her legal issues began, and she has "lost interest in life [] frequently expressing her desire to end her life and end her suffering." (Ex. AA).

10

For example, in his letter to the Court, Bezenchuk, Dr. Poroger's stepbrother, writes "You cannot imagine [Emma's] sadness and remorse in her lapse in not following [her] values." (Ex. F).  "Your Honor, it is hard for me to explain how much she has already been punished. Emma's health has deteriorated significantly over the past years.  She is filled with anxiety and depression which has exacerbated her chronic medical conditions." (Ex. G).  Koyfman similarly observed "Knowing Emma as well as I do, I can see the toll this ordeal has taken on her.  She was a woman who was capable of working 80-100 hours a week; now she can barely walk without a cane.  However, the physical ailments are nothing in comparison to the mental anguish she is experiencing." (Ex. K).

Dr. Isakov expressed that Dr. Poroger's main source of support is her son who visits her frequently and assures Dr. Poroger that she is safe. *Id.*  The instant case has taken a significant toll on Dr. Poroger.  "My mother was a vibrant and energetic woman, but in the last 3.5 years, her health has significantly deteriorated…Her mental health is also in serious decline."  (Ex. C); (Ex. DD).  Putting aside the onset of multiple crippling health issues, the fallout from her criminal case resulted in the loss of Dr. Poroger's medical practice and her means of financial independence.  "The fact that she will never again practice medicine has been an enormous emotional burden for Emma." (Ex. DD).

A condition of Dr. Poroger's plea agreement was that she forfeit her home located at 97 Giffords Lane in Staten Island (PSR ¶ 57).  Additionally, Dr. Poroger was left in financial ruin and with no choice but to file for Bankruptcy. (Second PSR Addendum).  Dr. Poroger has lost everything.

11

> Your Honor, I can tell you firsthand the shame, remorse and guilt my mother feels on [a] daily basis for what she has done.  She lives in misery and pain everyday, and she has spent many sleepless nights agonizing over how this will impact the future of her family.  She knows she made a mistake and is extremely regretful for what she has done.  She will never forget what happened, and she strives every day to live a moral and honest life.

(Ex. C).

## THE OFFENSE CONDUCT

From November 2006 through March 2009, Dr. Poroger served as the medical director for North Austin Medical, P.C., a medical clinic located in Forest Hills, Queens.  Poroger was hired as medical director by the co-owner of a billing company called Claim Torrent, Inc.  The North Austin office was managed by Queens North, Inc.  During Dr. Poroger's tenure at North Austin, approximately $13 million was billed in claims to Medicare under her Medicare provider number, of which approximately $4 million was paid.  A Significant portion of the $13 million billed to Medicare was resubmissions of claims previously denied.  Although Dr. Poroger signed an enrollment application that was submitted to Medicare in which she certified that all claims submitted under her provider number would be true, accurate, and medically necessary, Dr. Poroger left the task of submitting bills to Queens North and Claim Torrent.

Nevertheless, Dr. Poroger would provide Queens North and Claim Torrent with an accurate statement of the treatments she provided with accurate coding.  There is no dispute that Dr. Poroger honestly treated her patients to the best of her ability, performed services that she believed to be medically necessary, and never submitted fraudulent accounts of her treatments to patients.  She relied on the assurances of Queens North and Claim Torrent that the bills that

would be submitted to Medicare would accurately reflect the services she provided and the codes that she assigned to those services.

In September 2008, only about six months before she left North Austin, Dr. Poroger discovered that an electrocardiogram test was ordered for a patient without her knowledge or approval. She also noticed that around that time period, revenues increased significantly without any noticeable change in the number of patients she treated or the number of hours that she worked. At that point, Dr. Poroger became aware of circumstances that strongly indicated that her office manager and billing company were engaged in fraudulent billing. Although Dr. Poroger chastised her office manager for ordering and billing for the unnecessary test, she did not investigate whether fraudulent billing continued. She took no corrective measures to prevent fraudulent billing and did not inform law enforcement or Medicare of her discoveries. It was only after her arrest, when she began cooperating with the government, that she learned of the substantial scope of the fraudulent scheme.

## THE GUIDELINES CALCULATION

A district court should begin all sentencing proceedings by correctly calculating the applicable Sentencing Guidelines. *See United States v. Crosby*, 397 F. 3d 103, 112-13 (2d Cir. 2005). The defense agrees with the government and the Probation Department that the applicable Guidelines Manual in effect is the 2009 Guidelines. *See* PSR ¶10. Furthermore, the

defense agrees that the base offense level applicable to the offense is 6 and that a two-level enhancement for abuse of a position of trust is warranted under Section 3B1.3.[1]  The defense, however, strongly disputes the government and Probation's calculation of "loss" under Section 2B1.1, which asserts that a 20-level enhancement is warranted for a loss of over $13 million.  *See* U.S.S.G. § 2B1.1(b)(1)(K).

It is well established that loss under the Guidelines need not be established with precision, and the Court, in determining the loss, "need only make a reasonable estimate of the loss, given the available information."  *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009). Nevertheless, a "reasonable estimate" may not be based on "pure speculation."  *United States v, Deutsch*, 987 F.2d 878, 886 (2d Cr. 1993).  Nor can a flawed methodology that is the basis of an asserted loss amount satisfy the "reasonable estimate" standard.  *See United States v. Cuti*, 2011 WL 3585988, at *6 (S.D.N.Y. July 29, 2011) (holding that government failed to meet its burden in establishing loss because it refused to consider other relevant data and methodologies in arriving at its loss figure).  Indeed, a loss calculation must be based on clearly articulable conclusions and assumptions based upon evidence in the record and subject to evaluation by the

---

[1] The parties previously have submitted substantial briefing on the calculation of loss and on the potential enhancement for abuse of trust.  *See* Dkt. ## 63, 64, 65, 68, 74, 76, and 77.  In reviewing the Guidelines submissions, current counsel departs from the position of previous defense counsel as to the applicability of the two-level enhancement for abuse of trust under Section 3B1.3.  We concede that decisional authority supports the position of the government and Probation that the enhancement is warranted under the facts and circumstances of this case.  However, we dispute the government and Probation's calculation of loss under Section 2B1.1 for the reasons set forth herein.

defendant.  *See, e.g., United States v. Hartstein*, 500 F.3d 790, 796 (8th Cir. 2007) (vacating sentence and remanding where government presented summary tables regarding an accounting of the fraudulent loans at issue in the case, but the tables were based on evidence that was neither before the court nor available to the defense to evaluate).

The loss calculation advanced by the government and Probation of $13 million lacks a coherent methodology with respect to Dr. Poroger and is fundamentally flawed.  *First*, the $13 million figure is based on the total amount billed by North Austin to Medicare from October 2006 through March 2009.  *See* PSR ¶ 5; Dkt. ## 64, 73.  This calculation improperly assumes that all billing was fraudulent, notwithstanding that even the government must concede that legitimate services were performed for patients at North Austin.  Thus, the government's loss calculation ignores that a significant portion of the amount billed to Medicare was for legitimate services.

*Second*, the government does not dispute that Dr. Poroger first discovered fraudulent billing to Medicare in September 2008.  At that time, she learned that an electrocardiogram was ordered and billed without her authorization.  The government does not contend that Dr. Poroger knew at the time that the managers of the North Austin clinic and the billing company had been altering her accurate reports of the treatments she provided, and submitted bills to Medicare that overstated the extent of the services performed and included services that were never performed. In these circumstances, Dr. Poroger cannot, for Guidelines purposes, be held accountable for fraudulent billing pre-dating September 2008 because the scope of the fraudulent billing committed by her co-conspirators was not reasonably foreseeable to her.  *See, e.g., Familglietti v.*

15

*United States*, 2010 WL 996004, *2 (S.D.N.Y. Mar. 12, 2010) ("A defendant convicted of conspiracy is properly held liable for all of the victim's reasonably foreseeable losses"); *United States v. O'Campo*, 973 F.2d 1015, 1024 (1st Cir. 1992) ("[T]he concept of foreseeability (a forward looking concept) must be turned around 180 degrees [to] be applied to the conduct of co-conspirators occurring before the entry of a particular defendant into the conspiracy."); *Bryant v. Mattel, Inc.*, 2010 WL 3705668 (C.D. Cal. Aug. 2, 2010) ("[A] conspirator cannot reasonably foresee his co-conspirators' commission of overt acts prior to his entry into the unlawful agreement.").

In these circumstances, the appropriate time period to evaluate the loss properly attributable to Dr. Poroger under the Guidelines is September 2008 through March 2009.  During that time period, $2,458,440.91 was billed to Medicare under Dr. Poroger's Medicare PIN that was associated with North Austin.  *See* Dkt. #73 at 1.  That loss figure should be reduced by the amounts billed for legitimate services performed, and further by the $25,000 that Dr. Poroger voluntarily returned to Medicare during its audit of North Austin, prior to her indictment.  *See* Dkt. #74 at 5-8.  Assuming, however, the offsets do not bring the loss figure below $1,000,000, the appropriate loss calculation, even using the total amount billed from September 2008 through March 2009 is less than $2.5 million, and thus, only a 16-level enhancement is warranted under Section 2B1.1.  *See* U.S.S.G. § 2B1.1(b)(1)(I).

Accordingly, the appropriate Guidelines calculation is a level 21, which is premised on a base offense level of 6, a loss enhancement of 16 levels, a two-level adjustment for abuse of trust, and a three-level reduction for acceptance of responsibility.  The advisory Guidelines

sentence, given Dr. Poroger's lack of any prior convictions, is therefore 37-46 months imprisonment. For the reasons set forth in this memorandum, a downward departure under the Guidelines is warranted because with respect to relative culpability in the offense, the loss "overstates the seriousness of the offense" as to Dr. Poroger. *See* U.S.S.G. § 2B1.1, cmt. n. 19(c). Thus, the Guidelines themselves provide a basis for a sentence below the advisory Guidelines range. *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 422 (S.D.N.Y. 2004) ("While some members of Congress and journalists occasionally seem to misunderstand the concept, a sentencing departure does not constitute a subversion of the Sentencing Reform Act or of the guidelines system. In fact, notwithstanding the shorthand terminology sometimes applied, a departure is not a departure 'from the guidelines'; it is a departure from *the otherwise applicable guideline range.*") (emphasis in original).

Judge Rakoff's observation in imposing a below-Guidelines sentence in a recent case, finding that the loss amount was disproportionate to the offense is particularly apt here:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). *See also, e.g., United States v. Adelson*, 441 F.Supp. 2nd 506 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx. 93 (2d. Cir. 2008) (the "Sentencing Guidelines . . . in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as  . . . the amount of financial loss in fraud cases, without

17

however, explaining why it is appropriate to accord such huge weight to such factors."); *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) ("The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted the guideline's advice to sentencing judges.").

## ANALYSIS OF AN APPROPRIATE SENTENCE UNDER 18 U.S.C. § 3553(a)

We respectfully submit that a sentence of probation is warranted here under the factors set forth in 18 U.S.C. § 3553(a) in order to impose a sentence "sufficient but not greater than necessary" to satisfy the objectives of federal sentencing. *See Rita v. United States*, 551 U.S. 338, 348 (2007) (*quoting* 18 U.S.C. § 3553(a)). Under Section 3553(a), a district court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* § 3553(a)(1). Moreover, the court must impose a sentence that is "sufficient, but not greater than necessary" to, in pertinent part: (i) "reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense." (*Id.* § 3553(a)(2)(A)); (ii) "afford adequate deterrence to criminal conduct" (Id. § 3553 (a)(2)(B)); "protect the public from further crimes of the defendant" (*Id.* 3553(a)(2)(C)); and (iv) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." (*Id.* § 3553(a)(2)(D)). In conducting this analysis, the district court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Rather, "it must instead conduct its own independent review of the sentencing factors, aided by the argument of the prosecution and the defense." *United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2007). The "sentencing judge has a very wide latitude to

18

decide the proper degree of punishment for an individual offender and a particular crime." *Id*. at 188.

*First*, a non-custodial sentence is warranted based on the nature and circumstances of the offense and Dr. Poroger's personal characteristics. As set forth in the government's submissions to the Court, Dr. Poroger deserves consideration for the substantial assistance that she provided in the investigation and prosecution of the offense. Furthermore, it is undisputed that Dr. Poroger was a hard-working, devoted physician who never sought to steal from Medicare. Her sole purpose was to treat patients. She did not plan the offense or actively participate in it. Instead, she closed her eyes to the fraudulent scheme and did not take measures to investigate or stop the fraud when she was put on unquestionable notice that wrongdoing was afoot.

Nevertheless, Dr. Poroger did not enjoy the profits of the fraud. She worked 12-14 hour days and took a reasonable salary. Dr. Poroger lived comfortably in a home that she owned (with a mortgage), but hardly lived a lavish lifestyle. She lived modestly and focused her free time on caring for her parents and spending time with her son. Dr. Poroger was at most a reluctant participant in the fraudulent scheme and her failure to take action to stop the fraud represents a lapse in judgment over a short period in an otherwise exemplary life. Here, the Court should exercise its substantial discretion and impose a non-Guidelines, non-custodial sentence because the "defendant's commission of the instant offense[] was aberrant behavior", although perhaps "not aberrant as defined by the U.S. Sentencing Guidelines, but rather as defined by Merriam Webster: . . . atypical." *Gupta*, 904 F. Supp. 2d at 354.

19

*Second*, a non-custodial sentence is "sufficient, but not greater than necessary," to "reflect the seriousness of the offense . . . promote respect for the law, and . . . provide just punishment." 18 U.S.C. § 3553(a)(2)(A).  The offense for which Dr. Poroger was convicted is undoubtedly serious.  However, as discussed in this memorandum, Dr. Poroger ultimately suffered horrific personal, financial, and legal consequences as a result of her offense, and gained nothing.  Her culpability in the offense, for the reasons stated above, is much lower than that of her coconspirators.  Finally, in the over three years since her arrest, and the six years since the offense, Dr. Poroger has a demonstrated a track record of following the law and abiding by all the terms of her pretrial release.

In these circumstances, a non-custodial sentence is warranted.  *See, e.g., United States v. Paul*, 2007 WL 2384234 (9th Cir. Aug. 17, 2007) (within guideline sentence of 16 months (high end) for taking government money was unreasonably high in part because Paul was "a first-time offender with absolutely no criminal record whatsoever"); *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) (where defendant convicted of bankruptcy fraud and on probation for prior state conviction for fraud, and where guidelines range 27-33 months, sentence of probation, seven months of which was to be served under house arrest, and $5,000 fine, was not an abuse of discretion in part because proper for judge to consider that "by the time of the 2008 re-sentencing, the offenses had been committed nine years previously and that Edwards had left the stress of his earlier job in the construction business that led him to become involved in the financial fraud scheme, and completed without incident three and one half years of probation.").

20

*Third*, a non-custodial sentence "afford[s] adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). As a result of Dr. Poroger's alleged offense: (i) she will never again be licensed to practice medicine, (ii) her finances were devastated, (iii) her house was forfeited by the government; (iv) her physical and mental health have substantially deteriorated; and (v) she has spent approximately three-and-a-half year under pretrial supervision, which has involved significant restrictions on her ability to travel. In these circumstances, one "need only consider what happened to [Dr. Poroger] in order to reconsider [committing a similar offense]; thus, general deterrence [is] served. *United States v. Redemann*, 295 F. Supp. 2d 887, 897 (E.D. Wis. 2003). *See also, e.g., United States v. Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993) (the destruction of a defendant's only business, involving testing material for the EPA, warranted a downward departure in false statement case because elimination of the defendant's inability to engage in similar or related activities and the substantial loss of assets and income were a source of individual and general deterrence); *United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008) (district court's below-Guidelines sentence was not unreasonable in part because of collateral consequences where district court "specifically addressed other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and friends into the criminal justice system.").

21

Thus, in light of the adverse consequences Dr. Poroger suffered as a result of the alleged offense, a non-custodial sentence is more than sufficient to deter others from committing the same offense.  As the Supreme Court observed in *Gall v. United States*, 552 U.S. 38, 48 (2007):

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty . . . Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases, receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.  Most probationers are also subject to individual "special conditions" imposed by the court.

Similarly, Judge Gleeson observed in a recent opinion "when a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. Probation is less severe than a prison term, but both are punishment.  And as the Supreme Court has recognized, probation is *significant* punishment."  *United States v. Leitch*, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 2, 2013) (emphasis in original).  Indeed, special conditions of probation may include significant restrictions on liberty such as home detention.  *See* 18 U.S.C. § 3563(b)(19) (discretionary conditions of probation may include that the defendant "remain at his place of residence during nonworking hours and, if the court finds it appropriate, that compliance with this condition be monitored by telephonic or electronic signaling devices."); *United States v. Coughlin*, Crim. No-06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2009) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive.").

22

Here, Dr. Poroger has experienced the equivalent of three-and-a-half years of Probation by remaining under relatively restrictive conditions of pretrial supervision, especially for a person without significant assets, without overseas or unaccounted-for assets, without foreign ties, but with very strong ties to the community, and who has cooperated with the government.

*Fourth*, for the same reasons a sentence of probation is sufficient to achieve general deterrence, it is also sufficient to "protect the public from further crimes of the defendant." Indeed, the "personal, business and family consequences [Dr. Poroger has] experienced will likely deter [her] from future misconduct." *Redemann*, 295 F. Supp. 2d at 897; *United States v. Mizrahi*, 2008 WL 3009983, at *2 (E.D.N.Y. 1993) (where defendant loses his or her livelihood and is thus prevented from engaging in similar crimes, "the necessity for achieving the purposes of sentencing through sentencing itself has been reduced.").  In addition, because Dr. Poroger will never be able to practice medicine again, she will never again be in a position to commit a similar offense.  *See United States v. Speed Joyeros*, 204 F. Supp. 2d 412, 440 (E.D.N.Y. 2002) (departure appropriate where "defendant is barred by the destruction of business from committing similar future criminal acts"); *Gaind*, 829 F. Supp. At 671 (where the defendant loses his or her livelihood and is thus prevented from engaging in similar crimes, "the necessity for achieving the purposes of sentencing through sentencing itself has been reduced.").

*Fifth*, a non-custodial sentence is warranted in order "to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(D).  Dr. Poroger currently suffers from severe physical and psychiatric impairments.  Most seriously, she suffers from major cardiac conditions, impaired vision,

23

impaired movement, severe depression, severe anxiety, and suicidal ideation.  She is prescribed over 18 medications and requires frequent visits to her medical providers, who are fully familiar with her myriad conditions and have treated her for several years.  If Dr. Poroger is incarcerated, it is substantially unlikely that Dr. Poroger will receive the health care she desperately needs for her chronic physical and psychological conditions.

## CONCLUSION

Accordingly, a non-Guidelines, non-custodial sentence is sufficient, but not greater than necessary to satisfy the objectives of federal sentencing set forth in 18 U.S.C. §3553(a).  For the foregoing reasons, we respectfully request that the Court impose a non-custodial sentence.

Dated:  New York, New York
April 10, 2015

Respectfully submitted,
/s/ Eric M. Creizman

Eric M. Creizman
Melissa Madrigal
CREIZMAN PLLC
565 Fifth Avenue, 7th Floor
New York, New York 10017
Phone: (212) 972-0200
Fax: (646) 200-5022
ecreiz@creizmanllc.com
*Attorneys for Emma Poroger*

25